UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NATASHA M. BAPTISTA, Individually and as a Personal Representative of the Estate of Egidio M. Batista, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-11476-LTS |
| THOMAS M. HODGSON, RONALD DESCHENES, MICHAEL GONCALVES, JOSEPH CORDEIRO, MATTHEW RODRIGUES, and CITY OF NEW BEDFORD, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTIONS FOR SUMMARY JUDGMENT
(DOCS. NO. 62, 65)

January 24, 2019

SOROKIN, J.

Egidio Batista died from an injury he sustained while in a holding cell at the Ash Street Jail in New Bedford. His daughter, Natasha Baptista,[1] has brought suit against five individuals and the City of New Bedford[2] for claims arising out of Mr. Batista's death. The defendants have moved for summary judgment on all claims. For the reasons that follow, the motions for summary judgment are ALLOWED in part.

---

[1] Egidio Batista and Natasha Baptista spell their last names differently.
[2] New Bedford Chief of Police Joseph Cordeiro, Officer Matthew Rodrigues, and the City of New Bedford are collectively referred to as the "New Bedford Defendants." Sheriff Thomas Hodgson, Officer Ronald Deschenes, and Officer Michael Goncalves of the Bristol County Sheriff's Department ("BCSD") are collectively referred to as the "BCSD Defendants."

I.  BACKGROUND

   A.  Facts[3]

In July 2013, Egidio Batista lived in a first-floor apartment in New Bedford.  Doc. No. 78 ¶ 25.  His daughter, Natasha Baptista, and her young children lived in a second-floor unit in the same building.  Id. ¶ 18.  On July 20, 2013, Mr. Batista arrived home drunk and got into an argument with Ms. Baptista in the outdoor area of the apartment complex.  Id. ¶¶ 6, 19.  After taking her children upstairs to remove them from the situation, Ms. Baptista called 911.  Id. ¶¶ 19-20.  Officer Matthew Rodrigues of the New Bedford Police Department ("NBPD")[4] arrived at the apartment building and observed Mr. Batista sitting on the ground outside the door of his apartment.  Id. ¶¶ 8, 25.  Officer Rodrigues observed that Mr. Batista was "highly intoxicated, was difficult to understand, was sweating and may have urinated his pants."  Id. ¶ 26.  Mr. Batista told Officer Rodrigues about the verbal altercation he had with his daughter and that she called the police.  Id. ¶ 27.  After speaking with Ms. Baptista, Officer Rodrigues decided to take Mr. Batista into protective custody.  Id. ¶¶ 28, 30, 31.

Officer Rodrigues escorted Mr. Batista to the police cruiser without incident and transported him to the NBPD Headquarters.  Id. ¶¶ 32-33.  After photographing and booking Mr. Batista, Officer Rodrigues took him to the Ash Street Jail, pursuant to NBPD policy.  Id. ¶ 34.  Upon arrival at the Ash Street Jail,

---

[3] This factual summary is primarily derived from the Combined Joint Statement of Material Facts, Doc. No. 78, submitted by the parties.  In accordance with the summary judgment standard, the facts presented are only those over which there is no genuine dispute.  All reasonable inferences are drawn in the plaintiff's favor.

[4] Another officer arrived with Officer Rodrigues.  See Doc. No. 78 ¶ 24.  However, the other officer is not named as a defendant in this action and, based on the record, did not participate meaningfully in the events that transpired.

> Officer Rodrigues walked Mr. Batista to the admissions area, handed his report to a corrections officer, observed the initial medical evaluation of Mr. Batista[5] and left the Ash Street Jail once the paperwork had been signed off on by the corrections officer and Mr. Batista was placed in the custody and care of the Bristol County Sheriff's Department.

Doc. No. 78 ¶ 35. The surveillance video shows that Officer Rodrigues stayed in the booking area until Mr. Batista was placed in a temporary holding cell. Doc. No. 64-18. After leaving the Ash Street Jail, Officer Rodrigues did not have any further interaction with Mr. Batista. Doc. No. 78 ¶ 37.

When Mr. Batista arrived at the Ash Street Jail, Officers Ronald Deschenes, Michael Goncalves, and Gina DiNucci of the BCSD were on duty in the admissions area. Id. ¶¶ 47-51. Officer Deschenes was responsible for "searching incoming detainees and placing them into a temporary holding cell pending processing and booking." Id. ¶ 49. Officer Goncalves was responsible for completing the admissions paperwork. Id. ¶ 51. Officer DiNucci was responsible for maintaining visual supervision of the temporary holding cells through both a window and video surveillance. Id. ¶ 76. When Mr. Batista arrived, the larger of the two holding cells in the booking area was occupied by four males who had been arrested that afternoon. Id. ¶ 66. The other was occupied by a female who had been arrested. Id. ¶ 65.

---

[5] Plaintiff disputes that there was a medical evaluation of Mr. Batista upon his arrival at Ash Street Jail and in support, cites only to the Ash Street Video Surveillance Recording (Doc. No. 64-18). See Doc. No. 78 at ¶ 35. However, in his deposition, Officer Rodrigues stated that he observed the BCSD officers ask if Mr. Batista was suicidal or hurt, which he stated was the "medical evaluation" referred to in the NBPD policy. See Doc. No. 64-4 at 70-71. Because the surveillance recording has only video, but no audio, Ms. Baptista's citation to the surveillance recording cannot serve as the basis for disputing this testimony. See Doc. No. 64-18; see also Local Rule 56.1 (D. Mass.) (providing that facts the moving party has included in its statement of undisputed material facts "will be deemed for purposes of the motion to be admitted" if the opposing party has not "controverted" them "with page references to affidavits, depositions and other documentation"). As such, the Court accepts for purposes of summary judgment that Officer Deschenes asked Mr. Batista upon his arrival whether he was suicidal or hurt.

3

Mr. Batista was brought into the booking area by Officer Rodrigues and was then searched by Officer Deschenes. Id. ¶ 67. During this search, Mr. Batista spoke with Officer Deschenes in both English and Portuguese. Id. ¶ 68. Mr. Batista "was able to follow directions, to walk under his own power, and he was able to sit down in and get up from a seated position without assistance." Id. ¶ 69. After Officer Deschenes searched Mr. Batista and helped him remove his shoes, he placed Mr. Batista "into the temporary holding cell in the booking area that was occupied by four other male detainees." Id. ¶ 73. "Mr. Batista appeared reluctant to enter and be locked in the Ash Street Jail holding cell with four arrested detainees, and he tried to resist it." Id. ¶ 113. He asked Officer Deschenes why he was being placed in the cell and stated that he did not want to go into it. Id. ¶ 115.

Officer Deschenes nonetheless placed Mr. Batista in the cell. Id. ¶ 73. Officer Deschenes stayed in the booking area for a few moments where he observed Mr. Batista and the others in the holding cell before returning to his desk in another room of the Ash Street Jail, where Officer Goncalves was working at his own desk. Id. ¶¶ 74, 77; Doc. No. 64-18. From these desks, neither Officer Deschenes nor Officer Goncalves could observe the temporary holding cells where Mr. Batista and others were being held, either directly or on a video monitor, id. ¶¶ 75, 78, though Officer DiNucci maintained surveillance the entire time, id. ¶ 122. In fact, Officer Goncalves did not yet know that Mr. Batista had arrived at Ash Street Jail or that he had been placed in a temporary holding cell. Id. ¶ 78.

According to one of the other individuals held in the cell, Mr. Batista began "just walking back and forth and just swearing and stuff . . . [i]t looked like he was just trying to pick a fight with somebody." Id. ¶ 80. He "was getting into the face of the others in the cell and questioning what the other cellmates were going to do about it." Id. ¶ 81 (internal quotation marks omitted).

4

Within a few minutes of being placed in the holding cell, Mr. Batista made physical contact with Luis Mojica, one of the other individuals in the cell. Id. ¶ 83. In response, Mr. Mojica shoved Mr. Batista, who "fell to the ground, striking his head." Id. ¶ 86. Immediately thereafter, Officer DiNucci called a Code 99 which indicated to the other officers that there was an emergency in the booking area. Id. ¶ 87. Within ten seconds of Mr. Batista falling to the ground, multiple officers arrived in the booking area to respond to the situation. Id. ¶ 88.

The officers secured the scene and removed Mr. Batista from the holding cell, where they lifted him into a chair in order to assess his injuries. Id. ¶ 89; Doc. No. 64-18  A nurse arrived in the booking area to provide medical treatment to Mr. Batista. Id. ¶ 90. Mr. Batista was transported soon thereafter to a local hospital, where he died from his injuries the following morning. Id. ¶¶ 91-92.

B. Relevant Policies

There are a number of NBPD and BCSD policies which the plaintiff alleges were violated by the conduct of some or all of the defendants. The Court therefore summarizes the relevant portions of each of those polices.

The NBPD Custodial Procedures policy, pursuant to which Officer Rodrigues took Mr. Batista into protective custody, states that

> [t]he Bristol County Sheriff's Department is responsible for the care and custody of all adult detainees that are not brought to court or taken to another facility. Adult individuals . . . taken into protective custody shall ultimately be transported to the Ash Street Jail in New Bedford, where they will be . . . released pursuant to M.G.L. ch. 111B . . .

**Error! Hyperlink reference not valid.**. Additionally, the policy requires that upon arrival at the Ash Street Jail, "the transporting officer will remain with the detainee until the jail staff have conducted a brief medical screening prior to acceptance of the detainee." Id. at 11.

The Bristol County Sheriff's Office Regional Lock-up Policy ("Lock-up Policy")[6] sets forth the procedures for admitting, searching, and booking individuals brought to facilities such as the Ash Street Jail, and it applies equally to both protective custody detainees and to arrested individuals. Doc. No. 74-4 at 20. The Lock-up Policy provides that "[t]emporary holding cells . . . shall provide a temporary holding area for newly admitted prisoners and detainees before they are booked and escorted to the Regional Lockup." Id. at 10. The Lock-up Policy also states that

> [t]ypically, during the booking process, intoxicated and/or violent prisoners or detainees shall be segregated from others and placed in a separate temporary holding cells [sic]. Once that process is completed, the Booking Officer or Watch Commander shall ensure that the individual is placed in [a] separate cell within the Regional Lockup. Under no circumstances shall a violent, intoxicated or otherwise self-destructive prisoner or detainee be placed into a Regional Lockup[7] cell that is occupied by another person.

Id. at 20.

The BCSD also has a number of policies which forbid detainees of different genders from being housed together in a single cell. Id. ¶ 60. For example, the Perimeter and Security Control Procedures state that "[e]ach correctional facility shall . . . [n]ot permit male inmates to be housed with female inmates." Doc. No. 64-21 at 4. Additionally, the Sheriff's Office Admission, Booking and Orientation Policy states that "Booking Area holding cells shall be segregated for male and female inmates and detainees. At no time shall a male share a holding

---

[6] The policy referred to and quoted in the text is dated August 25, 2000. See Doc. No. 74-4 at 1. Based on the record and the statement of undisputed facts, this appears to be the policy that was in place on July 20, 2013. In the papers, the parties refer to a policy which made it mandatory to separate protective custody detainees from arrested individuals, see Doc. No. 74-8 at 1, but that policy was not enacted until July 31, 2013.
[7] The Court's understanding, based on the record, is that the "Regional Lockup" is a post-booking area in the Ash Street Jail facility which does not include the area where the temporary holding cells are located. See Doc. No. 74-4 at 3.

cell with a female." Doc. No. 64-22 at 6; see also Doc. No. 64-20 at 10 (the Lock-up Policy states that "[m]ales and females shall always be placed in separate temporary holding cells").

C. Claims

Natasha Baptista filed this lawsuit in July 2016. The amended complaint, Doc. No. 19, names six defendants: BCSD Sheriff Thomas Hodgson, Officer Deschenes, Officer Goncalves, NBPD Chief of Police Joseph Cordeiro, Officer Rodrigues, and the City of New Bedford.[8] Each of the five individuals are sued in their individual capacity. Doc. No. 19 ¶¶ 5-9. Ms. Baptista asserts nine claims in the amended complaint. Six of the claims assert violations of 42 U.S.C. § 1983 against the various defendants: Counts I (unconstitutional policies) and II (failure to train and supervise) are against Sheriff Hodgson; Count III (failure to protect) is against Officers Deschenes and Goncalves; Counts IV (unconstitutional policies) and V (failure to train and supervise) are against Chief Cordeiro; and Count VI (failure to protect) is against Officer Rodrigues. The remaining three claims assert state law causes of action against the City of New Bedford: Count VII asserts a claim for Mr. Batista's wrongful death; Count VIII asserts a claim for Mr. Batista's pain and suffering; and Count IX asserts a claim for negligent infliction of emotional distress on behalf of Ms. Baptista herself.

The BCSD Defendants moved for summary judgment on Counts I through III. Doc. No. 62. The New Bedford Defendants moved for summary judgment on Counts IV through IX. Doc. No. 65. Both sets of defendants have moved for summary judgment on the merits and on grounds of qualified immunity. Ms. Baptista opposed both motions. Doc. No. 73. The Court

---

[8] Ms. Baptista has also brought claims against the Bristol County Sheriff's Department in Bristol County Superior Court. The state docket number is 1673-CV-00694.

heard arguments from the parties on January 17, 2019. At the hearing, plaintiff's counsel stipulated to the dismissal of the claim against Officer Goncalves.

## II. LEGAL STANDARD

The Court applies the familiar summary judgment standard. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). However, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

"[I]t is well-established that constitutional claims arising out of protective custody under Mass. Gen. Laws ch. 111B, § 8 should be analyzed under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment." Lucia v. City of Peabody, 971 F. Supp. 2d 153, 160 (D. Mass. 2013); see also Ringuette v. City of Fall River, 888 F. Supp. 258, 261 (D. Mass. 1995) ("[T]he Court concludes that the Fourth Amendment governs the seizure of plaintiff taken into civil protective custody under Mass.G.L. ch. 111B, and that the substantive due process clause of the Fourteenth Amendment governs the conditions of the protective custody."). "The Fourteenth Amendment provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates. Generally, the standard applied under the

8

Fourteenth Amendment is the same as the Eighth Amendment standard." Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007) (citing Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir.2002)).

Prison officials "must take reasonable measures to guarantee the safety of the inmates," including those which "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (internal quotation marks and citations omitted). However, not every instance of inmate-on-inmate violence results in constitutional liability for prison officials. Id. at 833. For a claim alleging failure to prevent harm by another inmate, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and the prison official must demonstrate "deliberate indifference to inmate health or safety." Id. at 834 (internal quotation marks and citation omitted).

Therefore, in order to be liable, "a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Burrell, 307 F.3d at 8 (internal quotation marks and citation omitted). The First Circuit has likened this standard to that used for determining criminal recklessness. See id. The subjective part of this test may be satisfied by "the very fact that the risk was obvious." Id. Additionally, in defining "indifference," the First Circuit has held that "[p]rison officials cannot be indifferent, of course, if they are unaware of the risk. But even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Id. (citing Farmer, 511 U.S. at 844).

Additionally, in § 1983 claims, a defendant may not be held liable on a theory of vicarious liability. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). A supervisor who does not participate in the challenged conduct may therefore only be held liable "if (1) the behavior of his

9

subordinates results in a constitutional violation and (2) the supervisor's action or inaction was *affirmatively linked* to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence of the supervisor amounting to *deliberate indifference*." Hegarty v. Somerset Cty., 53 F.3d 1367, 1379–80 (1st Cir. 1995) (internal quotation marks and citations omitted) (emphasis in original). The First Circuit has held that "the causal link between a supervisor's conduct and the constitutional violation must be solid," and that the "causation requirement 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" Guadalupe-Baez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016) (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995)).

Supervisory liability therefore "may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'" Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (quoting Camilo–Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)). Under a theory of failure to supervise, train, or hire, "the analysis focuses on 'whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort.'" Id. (quoting Camilo-Robles, 175 F.3d at 44). A supervisor may also be subject to § 1983 liability "by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). "Thus, even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it." Id.

Finally, "[u]nder the doctrine of qualified immunity, police officers are protected 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). To defeat qualified immunity, "'the facts alleged or shown by the plaintiff' must 'make out a violation of a constitutional right' and the right must have been 'clearly established' at the time of the defendant's alleged violation." Id. (quoting Pearson, 555 U.S. at 231). To determine whether the right was "clearly established," the Court must consider

> (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right.

Id. at 32-33. The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality," but rather, to determine "whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). 'Clearly established' does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). On summary judgment, the Court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Mlodzinski, 648 F.3d at 29 (internal quotation marks and citation omitted).

III. DISCUSSION

    A. Chief Cordeiro

The amended complaint states specifically that Chief Cordeiro "is being sued in his individual capacity." Doc. No. 19 at 4. However, Joseph Cordeiro cannot be individually liable

11

under § 1983 because he was not the Chief of Police on the date of Mr. Baptista's death, and he did not have any hand in making the decisions or policies which plaintiff alleges contributed to his death. Cordeiro was not appointed Chief of Police until May 2016. Doc. No. 78 ¶ 171. On July 20, 2013, the date Mr. Batista was injured, he was an NBPD Captain assigned to Station Number One. Id. ¶ 11. On that date, Officer Rodrigues was assigned to Station Number Two, meaning then-Captain Cordeiro was not even his direct supervisor. Id. ¶ 12. Nothing in the record suggests that then-Captain Cordeiro had any supervision over Officer Rodrigues. As such, on the date of Mr. Batista's injury, there is no evidence that Chief Cordeiro was "subjectively . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" to Mr. Batista. Burrell, 307 F.3d at 8. There is also no evidence that he participated in "formulating a policy, or engaging in a custom, that lead[] to the challenged occurrence." Maldonado-Denis, 23 F.3d at 582. Accordingly, no reasonable jury could find that he was deliberately indifferent to a substantial risk of serious harm to Mr. Batista, and the motion for summary judgment is ALLOWED as to Counts IV and V.

  B. Officer Rodrigues

Ms. Baptista argues that Officer Rodrigues' individual liability stems from a violation of the Massachusetts Alcoholism Treatment and Rehabilitation Law ("ATRL"), Mass. Gen. Laws ch. 111B, § 8. Section 8 of the ATRL provides that "[a]ny person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station." Id. Ms. Baptista argues that the Ash Street Jail is not a "facility" or "police station" within the meaning of section 8, and as such, Officer Rodrigues' decision to take Mr. Batista to the Ash Street Jail violated the ATRL. See Doc. No. 73 at 5. However, even assuming, without deciding, that the Ash Street Jail is in fact neither a "facility" nor a "police station" within the

12

meaning of section 8, "[a] violation of a state statute, in itself, does not give rise to a cause of action under 42 U.S.C. § 1983." Ringuette v. City of Fall River, 906 F. Supp. 55, 58 (D. Mass. 1995) (citing Elder v. Holloway, 510 U.S. 510, 515 (1994)).

The question, therefore, is not whether Officer Rodrigues violated the ATRL by taking Mr. Batista to the Ash Street Jail, but rather whether he was deliberately indifferent to a substantial risk of serious harm to Mr. Batista by taking him to the Ash Street Jail or by leaving him there. On July 20, 2013, Officer Rodrigues did exactly what NBPD policy instructed him to do: he took Mr. Batista to the NBPD station to book him, transported him to the Ash Street Jail, and stayed with him until Officer Deschenes completed the medical evaluation and accepted care and custody. No evidence suggests that Officer Rodrigues had any reason to think that following this NBPD policy, as he and other officers did every day, presented a substantial risk of serious harm to Mr. Batista.

Ms. Baptista argues that because Officer Rodrigues was in the booking area with Mr. Batista while Officer Deschenes completed the medical evaluation, he must have seen the other four individuals located in the holding cell. Drawing all reasonable inferences in favor of Ms. Baptista, and in light of the surveillance video which shows Officer Rodrigues remaining in the booking area until after Officer Deschenes put Mr. Batista in the holding cell, the Court concludes for purposes of summary judgment that Officer Rodrigues did in fact see the four other individuals in the holding cell into which Mr. Batista was placed. See Doc. No. 64-18 at [05:48:15]. However, Officer Deschenes' act of putting Mr. Batista in the holding cell with four other individuals (who were unknown to Officer Rodrigues) did not put Officer Rodrigues on notice of a substantial risk of serious harm to Mr. Batista. There is no evidence in the record to suggest that any of these individuals or Mr. Batista had displayed any violent or aggressive

behavior in front of Officer Rodrigues which would allow him to draw the conclusion that Mr. Batista faced a substantial risk of serious harm by being placed in the holding cell, without even considering the ongoing surveillance of the cell by BCSD officers.

It is true, as Ms. Baptista argues, that Officer Rodrigues was aware of Mr. Batista's intoxicated state. When he arrived at Mr. Batista's apartment, "Officer Rodrigues observed that Mr. Batista appeared highly intoxicated, was difficult to understand, was sweating and may have urinated his pants." Doc. No. 78 ¶ 26. However, Officer Rodrigues also knew that Mr. Batista was not injured, id. ¶ 31, and that he "was able to stand up and walk to Officer Rodrigues' police cruiser without incident," id. ¶ 32. The surveillance video shows Mr. Batista walking on his own throughout the booking area and does not show him acting violently or aggressively at any point before Officer Rodrigues exits the booking area. In fact, there is nothing in the record to suggest that Mr. Batista was combative, aggressive, or anything other than compliant during the entirety of Officer Rodrigues' interactions with him. Based on the facts of which Officer Rodrigues was subjectively aware at the time he left the Ash Street Jail, no reasonable jury could find that he was deliberately indifferent to a substantial risk of serious harm to Mr. Batista. Therefore, the motion for summary judgment is ALLOWED as to Count VI.

    C.  Officer Goncalves

At the hearing on the motions for summary judgment, counsel for Ms. Baptista stipulated to a voluntary dismissal of the claims against Officer Goncalves. Accordingly, Count III is DISMISSED as to Officer Goncalves.

    D.  Officer Deschenes

As with the other defendants, Officer Deschenes' conduct must be examined based on what he knew at the time he placed Mr. Batista in the holding cell and left to go to the back

14

office. At that point in time, the record shows that Officer Deschenes knew the following information: there were four male arrested individuals in the larger holding cell and one female arrested individual in the smaller holding cell. He knew that BCSD policy absolutely forbade the comingling of males and females in holding cells, and that though BCSD policy generally preferred the separation of protective custody detainees from arrestees, it did not mandate it. Officer Deschenes also knew, from observing Mr. Batista, that he was intoxicated and needed help removing his shoes, but that he "was able to follow directions, to walk under his own power, and he was able to sit down in and get up from a seated position without assistance." Doc. No. 78 ¶ 69. Officer Deschenes knew that Mr. Batista did not have any items which might be used as a weapon because he searched him upon arrival at the Ash Street Jail. He knew the same of each of the other four individuals in the holding cell for the same reasons. Furthermore, Officer Deschenes knew that Mr. Batista denied being suicidal or injured.

Ms. Baptista argues that Officer Deschenes knew that Mr. Batista did not want to go into the holding cell, and that he resisted Officer Deschenes' first attempt to put him in it. Indeed, it is undisputed that "Mr. Batista appeared reluctant to enter and be locked in the Ash Street Jail holding cell with four arrested detainees, and he tried to resist it." Id. ¶ 113. Additionally, it is a reasonable inference, as Ms. Baptista suggests, that Officer Deschenes knew that at least one of the four individuals in the holding cell, Mr. Mojica, had been arrested for assault. See id. ¶ 117. However, there is no evidence in the record of any altercations between any of the other four individuals during the previous hours they had been in the cell. There is likewise no evidence in the record that Officer Deschenes was informed of any aggressive or violent behavior on the part of Mr. Batista which would indicate that he posed a potential threat to others or to himself.

At the time Officer Deschenes made the decision to place Mr. Batista in the holding cell, there was nothing about the circumstances which would have put him on notice that there was a substantial risk of serious harm to Mr. Batista. Ms. Baptista argues that there were other alternatives available to Officer Deschenes, such as booking Mr. Batista immediately and placing him in an individual cell in the Regional Lock-up or leaving him in the booking area outside of the holding cells until one of the other individuals could be booked, thus clearing a holding cell for him to occupy alone. That these alternatives may have been preferable in this case does not support an inference that placing Mr. Batista in the holding cell gave rise to a substantial risk of serious harm. Other cases illustrate that mere solitary cells can carry their own risks. See, e.g., Lucia, 971 F. Supp. 2d 153; Ringuette, 906 F. Supp. 55; Carroll v. City of Quincy, 441 F. Supp. 2d 215 (D. Mass. 2006).

Additionally, prison officials "cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Burrell, 307 F.3d at 8. Officer DiNucci was constantly monitoring the booking area on video and through a window from her position in admissions control. Officer Deschenes knew that Officer DiNucci could, as she in fact did, call an emergency if a fight or other problem began in the holding cells, and that both he and other officers were close enough to respond within seconds, as they did. Based on what he knew at the time he placed Mr. Batista in the cell, no reasonable jury could find that Officer Deschenes was deliberately indifferent to a substantial risk of serious harm to Mr. Batista.[9]

---

[9] Ms. Baptista points to several additional policies which she asserts Officer Deschenes violated, including one requiring individuals to be booked within thirty minutes of arriving at the Ash Street Jail, one requiring officers to use their "good judgment and common sense," and one which allows BCSD officers to refuse to accept custody of protective custody individuals

16

As discussed, the risk of placing Mr. Batista was not so obvious or substantial a risk as to give rise to a jury question. Cf. Perry v. Dickhaut, 125 F.Supp.3d 285, 296 (D. Mass. 2015) (granting summary judgment on a failure to protect claim where the defendants placed the plaintiff in a cell with a "known enemy" where there was "an objective basis for the . . . Defendants to reasonably believe that they were not exposing Plaintiff to a legitimate risk of serious harm"). In any event, Officer Deschenes is entitled to qualified immunity. There is no "clearly established" law which, given the "particular factual context of the case," would have allowed a reasonable officer to understand that his conduct violated the right in question. Mlodzinski, 648 F.3d at 32-33. Ms. Baptista points to no clearly established law which, as a constitutional matter, requires that individuals in protective custody be separated from arrested individuals based on these statuses. As such, Officer Deschenes is entitled to qualified immunity.

Accordingly, the motion for summary judgment is ALLOWED as to Count III, as to Officer Deschenes.

E. Sheriff Hodgson

As with Chief Cordeiro, the amended complaint specifically states that Sheriff Thomas Hodgson "is being sued in his individual capacity." Doc. No. 19 at 4. Sheriff Hodgson has been

---

brought by NBPD. Doc. No. 73 at 5-12. She also points to the part of the Lock-up Policy which states that "[u]nder no circumstances shall a violent, intoxicated or otherwise self-destructive prisoner or detainee be placed into a regional lockup cell that is occupied by another person." Id. at 10. Whatever relevance the asserted lack of compliance with these policies may have on the state law claims, the question for the federal claims is whether Officer Deschenes was deliberately indifferent to a substantial risk of serious harm to Mr. Batista when he placed him in the holding cell. For the reasons stated in the text, no reasonable jury could conclude that he was, based on the evidence in the record. In addition, Ms. Baptista has pointed to no clearly established law which requires the separation of protective custody detainees from arrested individuals as a constitutional matter.

17

the Sheriff of Bristol County since 1997 and was Sheriff on the date of Mr. Batista's injury. Doc. No. 78 ¶ 46. Sheriff Hodgson was not present at the Ash Street Jail at the time Mr. Batista arrived and did not have any knowledge of either Mr. Batista or Mr. Mojica until after Mr. Batista was injured. Id. ¶ 94. As noted, a supervisor may be held liable under § 1983 "if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was *affirmatively linked* to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence of the supervisor amounting to *deliberate indifference*." Hegarty, 53 F.3d at 1379–80. In this case, the behavior or Sheriff Hodgson's subordinates did not result in a constitutional violation, and therefore there is no supervisory liability. See also Perry, 125 F.Supp.3d at 299 ("Because there is no underlying conduct that was 'itself violative of a plaintiff's constitutional rights,' the assertion that the supervisors are also liable fails.") (quoting Maldonado-Denis, 23 F.3d at 582). Moreover, Sheriff Hodgson is also entitled to qualified immunity for the same reasons as Officer Deschenes. Accordingly, the motion for summary judgment is ALLOWED as to Counts I and II.

  F. <u>State Law Claims</u>

Given the dismissal of all federal claims, Counts I – VI, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, Counts VII – IX. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). "[T]he factors to be considered by a district court in determining whether to exercise supplemental jurisdiction include 'judicial economy, convenience, fairness, and comity.'" Sexual Minorities Uganda v. Lively, 899 F.3d 24, 35 (1st Cir. 2018) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). In this case, the balance of

18

factors weighs in favor of declining to exercise supplemental jurisdiction, particularly because of the pending litigation in state court involving some of the same parties and arising out of the same factual basis. The parties represented at the hearing on the motions for summary judgment that the state court litigation is set for a summary judgment hearing at the end of this month.[10] A single summary judgment decision and, to the extent there is a trial, a single trial better serve judicial economy, fairness, convenience, and comity than bifurcated proceedings. Accordingly, the state law claims, Counts VII, VIII, and IX, are DISMISSED without prejudice.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the motions for summary judgment, Docs. No. 62, 65, are ALLOWED as to Counts I, II, III, IV, V, and VI. Counts VII, VIII, and IX are DISMISSED without prejudice. Should the plaintiff choose to re-file Counts VII, VIII, and IX in state court, as she is entitled to do, the Court recommends that those claims be consolidated with the claims pending in Bristol County Superior Court, case number 1673-CV-00694. Additionally, the Court recommends, to the extent the City of New Bedford again seeks summary judgment on those claims, that the briefing submitted to this Court related to the state law claims be revived for use in summary judgment in state court.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[10] At the hearing, when discussing the potential dismissal of the state law claims, neither party raised the possibility that the statute of limitations might create a bar to the plaintiff refiling the claims in state court.

19